**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION**

| | | |
|---|---|---|
| THE HILLMAN GROUP, INC., | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 2:19-CV-00209-JRG |
| | § | |
| KEYME, LLC, | § | |
| | § | |
| *Defendant.* | § | |

**<u>MEMORANDUM OPINION AND ORDER</u>**

Before the Court is Plaintiff The Hillman Group, Inc.'s ("Hillman") Motion to Disqualify Cooley LLP (the "Motion to Disqualify"). (Dkt. No. 32.) The Court heard oral arguments regarding the Motion to Disqualify on January 21, 2020. Having considered the briefing and the oral arguments, the Court is of the opinion that the Motion to Disqualify should be and hereby is **GRANTED**.

**I.      BACKGROUND**

**A.   Cooley's Relationship with Minute Key**

Hillman's relationship with Cooley LLP ("Cooley") flows from its relationship with Minute Key—a company involved in the self-service key duplication kiosk business and now wholly owned by Hillman. (*See* Dkt. No. 32 at 7–9.) In June of 2018, Hillman announced that it was acquiring Minute Key. (Dkt. No. 32 at 5.) In August of 2018, the acquisition was completed, and Minute Key became a wholly owned subsidiary of Hillman. (*Id.*) Cooley, presently counsel for Defendant KeyMe, LLC's ("KeyMe"), represented Minute Key throughout its acquisition by Hillman. (*Id.* at 5; Dkt. No. 57 at 2.) Post-acquisition, Minute Key continues to operate as it did before, with the same employees, buildings, self-service key duplication kiosks, and intellectual

property. (Dkt. No. 32 at 5.) In December of 2018, Minute Key became fully merged into The Hillman Group, Inc.[1] (*Id.*) After this final merger, however, little, if anything, changed with Minute Key's business. (*Id.*)

Prior to the merger, Cooley represented Minute Key for over ten years. (Dkt. No. 57 at 2.) While the full scope of Cooley's representation of Minute Key is disputed between Hillman and KeyMe (collectively, the "Parties"), it is undisputed that Cooley's representation of Minute Key began around 2008 with Minute Key's retention of Noah Pittard—currently an equity partner at Cooley—to help with corporate financing. (*Id.*; Dkt. No. 115 at 17:13–14.) Mr. Pittard handled various and numerous matters for Minute Key in 2008 and thereafter. In 2012, Mr. Pittard began to regularly attend Minute Key board meetings—often acting as the *de facto* secretary of the board. (Dkt. No. 32 at 1, 12.) During this time, Minute Key never employed in-house counsel. According to Randall Fagundo—the President and CEO of Minute Key during the relevant time—Minute Key viewed Cooley, via Mr. Pittard, as their in-house counsel.[2] (*Id.* at 1–2.) Cooley, however, alleges that Mr. Pittard merely "advised Minute Key as outside counsel on corporate finance and governance and attended board meetings." (Dkt. No. 57 at 2.)

As a part of the many board meetings attended by Mr. Pittard, Hillman contends that he was exposed to confidential and privileged information about Minute Key's competitor strategies (*e.g.*, against KeyMe), product development, prosecution of two of the current patents-at-issue and their patent families, and litigation involving one of these patents (*i.e.*, U.S. Patent No. 8,979,446 (the "'446 Patent")) as well as related patents. (Dkt. No. 32 at 2.) During the period that Mr. Pittard

---

[1] Cooley claims that it was unaware of this final merger until August of 2019. (*Id.* at 3.)

[2] Mr. Fagundo submitted a declaration in which he stated that he viewed Mr. Pittard as filling the in-house counsel role at Minute Key. (Dkt. No. 32-2 at 1.) In addition, in a deposition in 2014 Mr. Fagundo further reinforced this belief by describing Cooley's role as that of "general counsel." (Dkt. No. 32-22 at 233:6–8.)

regularly attended board meetings, Minute Key was involved in three separate patent cases:[3] *Minute Key Inc. v. KeyMe*, 0:15-cv-1599 (D. Minn., 2015–2017); *Hillman Group, Inc. v. Minute Key, Inc.*, 1:13-cv-707 (S.D. Ohio, 2013–2014); *Hillman Group, Inc. v. Minute Key, Inc.*, IPR2015-01154 (P.T.A.B., 2015–2016). (*Id.*) According to Hillman, through these board meetings, Mr. Pittard was exposed to highly confidential material that would not be discoverable in the present case, such as litigation strategies and attorney work product.[4] (*Id.* at 2–5; Dkt. No. 115 at 11:14–13:23, 14:7–14:12, 15:7–19, 16:25–17:7.) Hillman further asserts that many of the "same validity and strategy issues" will be at issue in the above-captioned case. (Dkt. No. 32 at 3.) Finally, Hillman alleges that Cooley and Mr. Pittard assisted and advised Minute Key in its litigation strategy for their patent matters. (Dkt. No. 32 at 2–4.)

In response, Cooley maintains that Mr. Pittard "frequently attends his clients' board meetings and, in most cases, acts as secretary." (Dkt. No. 57 at 2.) Cooley also asserts that Mr. Pittard is "not a litigator" and has "no expertise related to patents or patent litigation." (*Id.*) In addition, Cooley points out that it did not actually represent Minute Key in any patent matter as all those cases where handled by other law firms.[5] (*Id.*) Finally, Cooley alleges that any information that Mr. Pittard may have received while at the Board meetings would be stale or discoverable in this litigation and thus is not an adequate basis for disqualification. (*Id.* at 14.)

---

[3] Each of these matters involved either the '446 Patent—asserted here—or a child of the '446 Patent. (Dkt. No. 32 at 2.)

[4] This includes information such as "Minute Key's product development, patent strategies, and competitive analysis." (*Id.* at 4.) Further, Hillman alleges that Cooley provided advice to Minute Key regarding "its competition with KeyMe." (*Id.*) In addition, Hillman alleges that through the board meetings Mr. Pittard was exposed to privileged information regarding "the origin of the invention described in [U.S. Patent No. 9,914,179], its scope, and information on related patents and applications." (*Id.* at 5.) Apparently, these meetings were not purely high-level status updates. On at least one occasion, Mr. Pittard sat through a multi-hour presentation by Minute Key's outside IP counsel on the status of Minute Key's patent litigation. (Dkt. No. 115 at 25:5–8.)

[5] Nonetheless, it is worth noting that Mr. Pittard and a Patent Attorney from Cooley—Mr. Wayne Stacy—were listed on a contact list for the then pending Hillman litigation. (*Id.* at 4.) Cooley claims that Mr. Stacy's work was minimal and only related to the settlement of that litigation. (Dkt. No. 57 at 8 n. 2.) While that may be true, the Court notes that the issue here is the risk that Cooley through its attorneys was exposed to confidential information, which this would reasonably suggest.

According to Cooley, the most recent work that Mr. Pittard performed for Minute Key was in October of 2018 and related to the initial acquisition of Minute Key by Hillman. (Dkt. No. 57 at 2.) Cooley represents that the most recent work that it performed for Minute Key was in late January of 2019 and was related to an unrelated tariff matter that predated the acquisition. (Dkt. No. 57 at 3.) Although this final work was billed to "Minute Key," it paid with a check drawn on and signed by Hillman. (Dkt. No. 32 at 6.) Since the early 2019 work, Cooley has performed no other work to Hillman or Minute Key. (Dkt. No. 57 at 3.) However, Hillman maintains that it still believed Cooley represented it and maintained Cooley on its list of approved vendors for legal services. (Dkt. No. 32 at 6; Dkt. No. 32-2 ¶6–7.) In fact, Hillman represents—and Cooley does not refute[6]—that Cooley never sent Minute Key (nor Hillman) any sort of disengagement letter nor returned Minute Key's confidential files to them. (Dkt. No. 32 at 6; Dkt. No. 77 at 1.)

### B. Procedural History of the Motion to Disqualify

Hillman filed the current suit against KeyMe on June 3, 2019, alleging that KeyMe's self-service key duplicating kiosks infringe the '446 Patent and U.S. Patent No. 9,914,179 (the "'179 Patent"). (Dkt. No. 1.) On July 25, 2019, KeyMe filed a Motion to Dismiss for Improper Venue under Rule 12(b)(3) (Dkt. No. 12) and a Motion to Change Venue (Dkt. No. 13). Also, on July 25, 2019, Michael G. Rhodes and Stephen R. Smith from Cooley filed notices of appearance in the above-captioned case on KeyMe's behalf.[7] (Dkt. Nos. 9, 10.) Shortly thereafter, the "Parties" requested, and the Court subsequently granted, limited venue discovery. (Dkt. No. 20; Dkt. No. 21.) Subsequently, Hillman filed an Amended Complaint on September 3, 2019, asserting the '446

---

[6] Cooley seems to rely on the fact that it only did two hours of work on Minute Key's tariff matter after the merger to indicate that Cooley's relationship with Minute Key had terminated. (Dkt. No. 57 at 6.) Cooley also points out that it declined a request for work from Hillman in August of 2019, "explaining that Hillman was not a client." (*Id.*) The Court finds this misses the point since August would be after this potential conflict arose and had been discussed between Hillman and Cooley.

[7] These two notices were the first indication on the docket that Cooley was involved in this case.

Patent, the '179 Patent, and one more additional patent—U.S. Patent. No. 10,400,474 (the "'474 Patent"). (Dkt. No. 30.) On September 4, 2019, Hillman filed the present Motion to Disqualify. (Dkt. No. 32.)

Hillman says it first learned of Cooley's involvement on July 24, 2019, when a Cooley attorney contacted Hillman's counsel seeking a Local Rule CV-7(h) meet and confer conference. (Dkt. No. 32 at 6.) Hillman claims that it immediately began investigating the potential conflict, because at the time Hillman believed that it was still a Cooley client . (*Id.*) After its preliminary investigation, Hillman notified Cooley of the conflict of interest in a detailed letter dated August 7, 2019. (*Id.*)

On August 15, 2019, Cooley responded by letter claiming that Hillman was not a client and contending it had no conflict. (*Id.*) Cooley also claimed that it had erected an ethical wall to screen off any lawyers who worked on Minute Key matters. (Dkt. No. 32-32 at 2.) On August 19, 2019, Hillman responded requesting details on Cooley's alleged ethical screen and reasserting that Hillman was still a current client of Cooley's. (Dkt. No. 32 at 6.) The Parties met and conferred on August 26, 2019 but were unable to resolve the issue. (*Id*) According to Hillman, it never got any details on the ethical screen or about the files of Minute Key that Cooley possessed. (Dkt. No. 115 at 15:24–16:11.)

On January 21, 2020, this Court held a hearing on the Motion to Disqualify. Following the hearing, the Court ordered the Parties to meet and confer regarding how the ethical screen is structured and how it operates. (*Id.* at 36:16–22.) The Court further ordered Mr. Rhodes from Cooley to file a supplemental declaration within 72 hours of that conversation detailing the substance of that meet and confer and describing the real-world functionality of the ethical screen in place. (*Id.* at 36:25–37:5.) The Court received Mr. Rhodes' declaration on January 23, 2020.

(Dkt. No. 108.) Ryan O'Quinn—counsel for Hillman—then filed a supplemental declaration regarding Mr. Rhodes' declaration on January 28, 2020.[8] (Dkt. No. 110.)

## II.    LEGAL STANDARD

Under Fifth Circuit law, a motion to disqualify is a substantive motion "affecting the rights of the parties" and is thus "determined by applying standards developed under *federal law*." *In re Am. Airlines, Inc.*, 972 F.2d 605, 610 (5th Cir. 1992) (quoting *In re Dresser Industries*, 972 F.2d 540, 543 (5th Cir.1992)). While the Fifth Circuit is "sensitive to preventing conflicts of interest," the Fifth Circuit has warned that disqualification should not be applied "mechanically" or "cavalierly." *In re ProEducation Int'l, Inc.*, 587 F.3d 296, 299-300 (5th Cir. 2009) (citing *In re Am. Airlines*, 972 F.2d at 610; *FDIC v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1312 (5th Cir.1995)). Rather, the Fifth Circuit has directed courts to carefully "consider '[a]ll the facts particular to [the] case . . . in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights.'" *Id.* at 300 (quoting *U.S. Fire Ins.*, 50 F.3d at 1314.); *Woods v. Covington Cty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976) ("A court should be conscious of its responsibility to preserve a reasonable balance between the need to ensure ethical conduct on the part of lawyers appearing before it and other social interests, which include the litigant's right to freely chosen counsel.") To that end, courts are to consider a motion to disqualify "in light of the litigant's rights and the public interest, considering 'whether a conflict has (1) the appearance of impropriety in general, or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case.'" *Horaist v. Doctor's Hosp. of Opelousas*, 255 F.3d 261, 266 (5th Cir. 2001) (citing *In re Dresser Indus.*, 972 F.2d at 543).

---

[8] From reviewing the declarations, it is clear that there is still a dispute regarding the efficacy of the ethical wall in question.

When deciding a motion to disqualify, a court first looks at that court's specific local rules. *U.S. Fire Ins. Co.*, 50 F.3d at 1312. In the Eastern District of Texas, "[t]he standards of professional conduct adopted as part of the Rules Governing the State Bar of Texas shall serve as a guide governing the obligations and responsibilities of all attorneys appearing in this court." LOCAL RULE AT-2(a). District courts, however, are not limited to their local rules in deciding a motion to disqualify. *In re Am. Airlines*, 972 F.2d at 610. In fact, in reviewing motions to disqualify, courts are to also "consider the ethical rules announced by the national profession in light of the public interest and the litigants' rights." *Id.* To this aim, the Fifth Circuit has acknowledged that the ABA Model Rules of Professional Conduct (the "Model Rules") are the "national standards to consider in reviewing motions to disqualify." *In re ProEducation Int'l*, 587 F.3d at 299.

In the current Motion to Disqualify, Hillman alleges two separate grounds why Cooley should be disqualified: (1) that Cooley should be disqualified because Hillman is a current client of Cooley, and, alternatively, (2) that Cooley should be disqualified because Hillman is a former client and Cooley's representation of KeyMe in this case is substantially related to Cooley's past representation of Minute Key and the confidential information it received. (Dkt. No. 32 at 9–15.)

### A. Conflicts of Interests with Current Clients

Rule 1.06(b)(1) of the Texas Disciplinary Rules of Professional Conduct ("Texas Rules") and Rule 1.7 of the Model Rules govern conflicts of interests involving representation of concurrent clients. While normally the Texas Rules and Model Rules are the same, in this situation the Court faces a disparity between these rules. *See Gen. Elec. Co. v. Mitsubishi Heavy Indus., Ltd.*, No. 3:10-CV-276-F, 2011 WL 13201855, at *4 (N.D. Tex. Sept. 12, 2011). Under the Texas Rules, a lawyer is only prevented from concurrently representing two adverse clients if the matters are "substantially related." Texas Rules Rule 1.06(b)(1) ("involves a *substantially related* matter

in which that person's interests are materially and directly adverse to the interests of another client of the lawyer or the lawyer's firm.") (emphasis added). Under the Model Rules, however, a lawyer cannot represent a client if "the representation of one client will be directly adverse to another client." Model Rules Rule 1.7(a)(1); *see also* Model Rules 1.7 Comment 6 ("Thus, absent consent, a lawyer may not act as an advocate in one matter against a person the lawyer represents in some other matter, even when the matters are wholly unrelated.").

Faced with this conflict, the Court must decide in this case which rule should apply. Considering the guidance of existing Fifth Circuit precedent, this Court concurs with the Northern District of Texas that "the narrower national standards apply." *Gen. Elec. Co.*, 2011 WL 13201855 at *4. As mentioned above, motions to disqualify are substantive motions and "are determined by applying the standards developed under federal law." *In re Dresser Industries*, 972 F.2d at 543. Further, the Fifth Circuit has made clear that "[o]ur source for the standards of the profession has been the canons of ethics developed by the American Bar Association." *Id.* The Fifth Circuit has further stated that "[u]nquestionably, the national standards of attorney conduct forbid a lawyer from bringing a suit against a current client without the consent of both clients." *Id.* at 545. Considering this guidance, the Court is of the opinion that the more stringent standard from the Model Rules should apply to conflicts of interest with concurrent clients. Having reached this conclusion, the Court need not determine if Cooley's past representation of Hillman by way of Mr. Pittard's participation in board meetings where long range strategic planning occurred is substantially related to the current issues in this case. That said, the Court notes that Hillman's arguments to that effect are compelling, on their face.

### B. Conflicts of Interests with Former Clients

Rule 1.09(a) of the Texas Rules and Rule 1.9 of the Model Rules govern conflict of interests with former clients. Unlike the rules with concurrent clients, the Texas Rules and the Models Rules are identical "in all important aspects." *In re Am. Airlines*, 972 F.2d at 615 n.2. Given their similarity, the Court will focus its analysis using the Model Rules Rule 1.9, which states:

> [a] lawyer who has formerly represented a client in a matter shall not thereafter represent another person *in the same or a substantially related* matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent, confirmed in writing."

(emphasis added). While not explicitly defined in the Model Rules, Comment 3 to Rule 1.9 of the Model Rules provides that:

> [m]atters are "substantially related" for purposes of this Rule if they involve the *same transaction* or *legal dispute* or if there otherwise is a *substantial risk that confidential factual information* as would normally have been obtained in the prior representation *would materially advance the client's position* in the subsequent matter.

(emphasis added). Thus, in a motion to disqualify on the grounds of a former client relationship, the movant must show: "1) an actual attorney-client relationship between the moving party and the attorney he seeks to disqualify and 2) a substantial relationship between the subject matter of the former and present representations" or a risk of the improper use of confidential information. *In re Am. Airlines*, 972 F.2d at 614–15. Finally, conflicts of interest either for former clients or for concurrent clients are imputed to an attorney's entire firm. Model Rules Rule 1.10; Texas Rules Rule 1.06(f).

## III. ANALYSIS

In light of the facts of this case and Fifth Circuit law, the Court finds that Cooley's attorney-client relationship with Minute Key never terminated. Further, the Court finds that such relationship was succeeded to by Hillman as part and parcel of the Minute Key acquisition. As

such, the Court finds that Hillman is a current client of Cooley and, thus, that Cooley has a concurrent conflict of interest under Rule 1.7 of the Model Rules. The Court further finds that, even if this were not the case, there is a real risk of confidential information from Minute Key being used against Hillman in this lawsuit. The Court finds that Cooley's prior representation of Minute Key is substantially related to the present action. This results compels the Court to hold that disqualification of Cooley is warranted in this case.

### A. Minute Key/Hillman is a Current Client of Cooley

*i.     Minute Key's Attorney-Client Relationship Transferred to Hillman.*

As an initial matter the Court must decide whether Minute Key's attorney-client relationship transferred to Hillman when Hillman acquired Minute Key. The Court finds that it did. The Parties agree that the "practical consequences" of the acquisition and merger control the answer to this question. (Dkt. No. 77 at 1 (citing *John Crane Prod. Sols., Inc. v. R2R & D, LLC*, No. 3:11-CV-3237-D, 2012 WL 3453696, at *3 (N.D. Tex. Aug. 14, 2012)); Dkt. No. 84 at 5.) Under this analysis, "[i]f the practical consequences of the transaction result in the transfer of control of the business and the continuation of the business under new management," the attorney-client relationship will follow as well. *John Crane Prod. Sols., Inc.*, 2012 WL 3453696, at *3 (citing *Soverain Software LLC v. Gap, Inc.*, 340 F. Supp. 2d 760, 763 (E.D. Tex. 2004) (citing *Commodity Futures Trading Commn. v. Weintraub*, 471 U.S. 343, 349 (1985) ("[W]hen control of a corporation passes to new management, the authority to assert and waive the corporation's attorney-client privilege passes as well."))). In looking at the "practical consequences" of a transaction, some courts have looked specifically at factors such "as the extent of the assets acquired, including whether stock was sold, whether the purchasing entity continues to sell the same product or service, whether the old customers and employees are retained, and whether the same patents and trademarks are used." *John Crane Prod. Sols., Inc.*, 2012 WL 3453696, at *3.

Considering the "practical consequences" of this merger, the Court finds that in acquiring and merging with Minute Key there was a "transfer of control of the business and the continuation of the business under new management" to Hillman. *See Soverain Software*, 340 F. Supp. 2d at 763. Prior to Hillman's acquisition of Minute Key, Minute Key had one singular business—self-service key duplication kiosks—with its main office in Boulder, Colorado. It held and owned intellectual property in the name "Minute Key" and relating to the technology involved in their kiosks. (Dkt. No. 32 at 1, 5.) After the merger, Minute Key maintained their home office in Boulder, Colorado. (*Id.* at 5.) Minute Key also maintained most of the same employees. (*Id.*) Most importantly, Minute Key continued its one sole business—self-service key duplication kiosks—under its same name and implementing its same intellectual property. (*Id.*) The only real change after the merger in June 2018 was that Hillman internally integrated Minute Key into its corporate structure and combined their executive management teams. (*Id.*) Then in December 2018, on this same basis, Minute Key completed its full merger into Hillman. (*Id.*)

In light of this history, it is clear to the Court that Minute Key's attorney-client relationship with Cooley transferred to and was succeeded to by Hillman. Hillman is the complete successor, in law and fact, to Minute Key. Hillman continued Minute Key's existing business unchanged. The same employees (and presumptively customers) were retained. The same patents and trademarks were used. Thus, the Court finds that Hillman continues to run Minute Key's business as before but simply "under new management" and, as a result the attorney-client relationship transferred as well from Minute Key to Hillman.[9] *See Soverain Software*, 340 F. Supp. 2d at 763 (citing *Commodity Futures Trading Commn.*, 471 U.S. at 349).

---

[9] The Court further points out that Cooley seemingly conceded that Minute Key's attorney-client relationship with Cooley passed to Hillman at oral argument. (Dkt. No. 115 at 29:22–30:13 (acknowledging in response to questioning from the Court that "we have to look at the substantial relationship test" for determining a conflict of interest).)

The next matter that the Court must decide is the scope of Cooley's representation of Minute Key. In determining the scope of an attorney-client relationship, courts look "to the actions of the parties." *See Gen. Elec. Co.*, 2011 WL 13201855 at *7. This is often revealed by both "the implicit and explicit actions of the parties." *Id*. at *6. Considering the facts of this case, the Court finds that Cooley's prior representation of Minute Key was broad, unrestricted, and highly akin to the role of in-house general counsel.

The Court finds the relationship presented in *General Electric* to be both similar and informative in this case. In *General Electric*, the attorneys at issue had a "decades-long relationship" with the opposing party. *Id at *7*. Over the course of this relationship, the attorneys helped the opposing party with "various, intermittent disputes relating to contracts concerning its [business] as they arose." *Id*. Faced with these facts, the Northern District of Texas found that "[t]he attorney-client relationship . . . was ongoing and open-ended." *Id*.

Similarly, Minute Key had a long-term relationship with Cooley for roughly ten years prior to the merger of Minute Key and Hillman. (Dkt. No. 57 at 2.) Mr. Pittard and Cooley represented Minute Key on a variety of matters, even providing advice as to matters where they did not directly represent Minute Key. (Dkt. No. 32 at 1, 4, 12; Dkt. No. 32-22 at 233:6–8 (Mr. Fagundo stating in deposition testimony in 2014 that Minute Key switched counsel in one of their patent cases based on advice by "Cooley, who's [Minute Key's] general counsel."); Dkt. No. 57 at 2, 8.) In addition, during the period of 2012–2018, Mr. Pittard attended almost every Minute Key board meeting and often acted as the Secretary at those meetings. (Dkt. No. 32 at 1, 12.) The Court further notes that during this time Minute Key had no general counsel, and that the then-serving President and CEO of Minute Key considered Mr. Pittard (and through him Cooley) as Minute Key's general in-house

counsel. (*Id.* at 1–2.) At oral argument counsel for Cooley acknowledged that Cooley and Minute Key had an "outside corporate securities general counsel-type relationship." (Dkt. No. 115 at 23:21–25.)

In light of this evidence, it is clear that Cooley's representation was "ongoing and open-ended" and more akin to that of an in-house general counsel than anything else. *See Gen. Elec. Co.*, 2011 WL 13201855 at *7 ("[T]he Court looks to the actions of the parties as a manifestation of their intent concerning the purpose of their attorney-client relationship. . . . [T]he evidence indicates that the two entities contemplated an ongoing relationship that had the purpose of allowing [the client] to bring matters to [the attorneys] for legal advice and consultations as needed.") As in *General Electric*, Cooley and Minute Key had a long history and neither party had any intention of ending their relationship.[10]

### iii. *Minute Key/Hillman is a Current Client of Hillman.*

Having determined the scope of Cooley's representation of Minute Key and that Minute Key's attorney-client relationship was succeeded to by Hillman, the Court must now determine whether Hillman is a current or a former client. In light of Cooley's broad and ongoing "on-call" representation of Minute Key and the facts of this case, the Court finds that Hillman is a current client of Cooley.

Generally, an attorney-client relationship ends "once the purpose of the employment is completed, absent a contrary agreement." *Simpson v. James*, 903 F.2d 372, 376 (5th Cir. 1990), *as amended on denial of reh'g* (July 6, 1990). However, courts also recognize that when the purpose

---

[10]Cooley dismisses *General Electric* on the grounds that the relationship involved "was significantly narrower than the purported unlimited 'general counsel' role that Minute Key alleges Cooley occupied." (Dkt. No. 57 at 6.) Cooley further argues that the case "is inapposite" because it did not involve a transfer of that relationship. (*Id.*) In response, the Court notes that the broader relationship between Minute Key and Cooley more strongly supports the position that their relationship was "ongoing and open-ended." Here the Court is simply analyzing the relationship between Minute Key and Cooley. Whether that relationship continued after the merger is a separate question discussed in Section III(A)(iii).

of a representation is for the attorney to be "on standby" that the attorney-client relationship is "ongoing and open-ended." *Gen. Elec. Co.*, 2011 WL 13201855 at *7. The attorney-client relationship can persist even when there are no pending projects. *Id.* ("An [ongoing, needs-based] attorney-client relationship . . . does not lapse as soon as the attorney finishes his work on a particular project; it carries on as new projects arise.") *Id.*

The Court now addresses whether the attorney-client relationship was terminated prior to Cooley's representation of KeyMe in this case. The relevant timeframe in making this determination is "during the pendency of th[e] case." *Rembrandt Techs., LP v. Comcast Corp.*, No. CIV.A. 2:05CV443, 2007 WL 470631, at *3 (E.D. Tex. Feb. 8, 2007). There is no doubt that presently Cooley has made representations that its relationship with Minute Key, and by extension Hillman, is over. However, that is not the question. The question is whether the relationship was terminated as of the filing of this case.[11]

Hillman argues that Minute Key's relationship with Cooley was not terminated by the merger of Minute Key into Hillman. (Dkt. No. 32 at 9.) Hillman further argues that, given the type of relationship between Cooley and Minute Key, their relationship continued until at least the filing of this case and Cooley's appearance. (*Id.*) Hillman argues that if Cooley wanted to end the relationship then it should have given notice to Hillman and returned Minute Key's client files to it. (*Id.* at 9–10.); *see* Texas Rules Rule 1.15(d) ("Upon termination of representation, a lawyer shall . . . giv[e] reasonable notice to the client, allow[] time for employment of other counsel, surrender[] papers and property to which the client is entitled and refund[] any advance payments of fee that

---

[11] The critical date in this case would be on or near July 24, 2019, when Cooley, on behalf of KeyMe, first participated in a meet and confer with Hillman attorneys. (Dkt. No. 32 at 6.) Cooley claims that their representation of KeyMe "began in August 2019," (Dkt. No. 57 at 7), but this is demonstrably incorrect given the appearances filed on the docket dated July 25, 2019. (Dkt. Nos. 9, 10.) Presumably, Cooley must have begun representing KeyMe several days or weeks before the meet and confer considering they filed two Rule 12(b) motions the day following the meet and confer.

has not been earned"). Finally, Hillman argues that it "reasonably understood Cooley represented it" and that their relationship continued. (Dkt. No. 32 at 10 (citing *TQP Dev., LLC v. Adobe Sys. Inc.*, No. 2:12-CV-570-JRG-RSP, 2013 WL 3731492, at *2 (E.D. Tex. July 13, 2013)).)

Cooley responds that Hillman is not and never was a client of Cooley. (Dkt. No. 57 at 5.) Further, Cooley argues that the merger of Minute Key into Hillman terminated any relationship that existed between Cooley and Minute Key. (*Id.* at 5–6.) Cooley alleges that Mr. Pittard has not performed any work for Minute Key since October 2018, when the acquisition ended. (*Id.* at 6.) While other Cooley attorneys performed work for Minute Key in January 2019, Cooley argues that such work was done on a project that had been pending since 2016 and that at the time Cooley did not know that Hillman and Minute Key had merged. (*Id.*) Cooley also points out that it declined a request for work from Hillman in August 2019. (*Id.*)

On balance, the Court is not convinced by Cooley's arguments and finds that Hillman is a current client of Cooley. Here again, the Court finds *General Electric* instructive. In *General Electric* the court found that there was an "ongoing, needs-based attorney-client relationship." *Gen. Elec. Co.*, 2011 WL 13201855 at *7. There, the court found that just because the attorneys at issue were not actively doing anything for the opposing party at the time the suit was filed does not mean that there was no longer an attorney-client relationship. *Id.* As there, Cooley had a long-lasting relationship with Minute Key. That there was a break of eight to nine months,[12] is not sufficient, without more, to terminate the attorney-client relationship.

Cooley argues that this Court should follow the ruling in *Erfindergemeinschaft Uropep GbR v. Eli Lilly & Co.* (Dkt. No. 115 at 18:12–20:11 (citing No. 2:15-CV-1202-WCB, 2016 WL 760909 (E.D. Tex. Feb. 26, 2016)).) In *Eli Lilly*, the court found that there was no concurrent

[12]The longest gap in time Cooley can claim is from October 2018, when Mr. Pittard did his "last work" for "Minute Key," to June or July 2019, when Hillman sued KeyMe or Cooley appeared officially in the case.

representation when the law firm at issue had represented a party in a past litigation and now represented an adverse party. 2016 WL 760909 at *4–*6. However, in that case, the prior representation was limited under the specific terms of its engagement letter to only the representation in that first case. *Id*. at *4. Also, the first case was fully resolved and closed for more than a year by the time the law firm became adverse to the original client.[13] *Id*. Under these facts, the court found that the party seeking disqualification had not overcome the express language of the letter of engagement, and thus that there was no concurrent representation.

The present case is inapposite to *Eli Lilly*. Unlike *Eli Lilly*, Cooley's representation was not limited to one case but was long-lasting, broad, and more akin to the role of a general counsel. *See* Section III(A)(ii). Here there is no engagement letter before the Court which defines Cooley's role, and Cooley themselves admits that their representation was at least that of an "outside corporate securities general counsel-type."[14] (Dkt. No. 115 at 23:21–25.) Cooley's on-going relationship with Minute Key for roughly ten years is much more than one case.

In both this case and *Eli Lilly*, neither firm sent a disengagement letter prior to representing the adverse client. *See Eli Lilly*, 2016 WL 760909 at *2. In *Eli Lilly*, however, the firm's representation of the original client was clearly limited by an express engagement letter to that one case. *Id*. Since attorney-client relationships generally terminate once the purpose of the representation is complete, there was no need for the firm to send a disengagement letter. *Id*. at *4. However, Cooley's representation in this case was not constrained, but instead was broad and

---

[13]The law firm in that case also performed no work for the original client after the case was resolved. *Eli Lilly*, 2016 WL 760909 at *4.

[14]The Court notes that in Section III(A)(ii) above, the Court found that Cooley's representation of Minute Key was more akin to an in-house general counsel type relationship than the relationship described by Cooley at oral argument.

indefinite. Under such disparate circumstances the fact that Cooley never sent a disengagement letter is highly relevant.

Hillman, in support of their motion, cites *Eastman Kodak Co. v. Sony Corp.* for the proposition "that acquisition and integration of a current client meant that the acquiring entity became a current client." (Dkt. No. 32 at 7–8 (citing No. 04-CV-6095, 2004 WL 2984297, at *3 (W.D.N.Y. Dec. 27, 2004)).) In *Eastman Kodak*, Woods Oviatt Gilman, LLP ("Woods") made a living by not having Kodak as a client so that it would not be conflicted in taking cases against Kodak. *Eastman Kodak*, 2004 WL 2984297 at *1. One of the many clients it represented was a company called Heidelberg Digital LLC ("Heidelberg"). *Id*. This representation lasted for many years. *Id*. In May 2004, however, Kodak announced it would acquire Heidelberg. *Id*. Woods did not actively participate in the acquisition but did maintain Heidelberg's records at their offices for Kodak to review and the acquisition was widely publicized. *Id*. After the acquisition, Kodak "assumed responsibility for all litigation matters involving Heidelberg." *Id*. at 2. In August 2004, Kodak discovered that Woods was representing some parties that were adverse to Kodak. *Id*. Woods responded that Heidelberg was a client, but Kodak was not, so they saw no conflict. *Id*. The New York District Court disagreed. *Id*. at 9. There, the court found that "for conflict purposes, Kodak and Kodak's wholly owned subsidiary, Heidelberg, are to be treated as a single client." *Id*. In making this determination, that court looked at "whether the corporate relationship between the two corporate family members is 'so close as to deem them a single entity for conflict of interest purposes.'" *Id*. at 3 (quoting *Discotrade Ltd. v. Wyeth-Ayerst International, Inc.*, 200 F. Supp. 2d 355, 358 (S.D.N.Y. 2002)). The court noted that when Kodak acquired Heidelberg it "essentially swallowed Heidelberg." *Id*. Ultimately, the court found that "[p]ut simply, without Kodak's consent, it is ethically impermissible for [Woods] to have a *wholly owned and integrated*

*subsidiary* of Kodak as a client and simultaneously represent Kodak's adversaries in pending litigation in state and federal court." *Id.* at 5 (emphasis added).

The Court finds *Eastman Kodak* to be persuasive. As in *Eastman Kodak*, Cooley had a long relationship with Minute Key. (Dkt. No. 57 at 2.) Cooley knew about the acquisition of Minute Key by Hillman because it was widely publicized and they represented Minute Key in the acquisition. (Dkt. No. 32 at 5; Dkt. No. 32-25.) Finally, there was a delay of only a few months between the acquisition and the filing of the current suit, during which Cooley did not do work for Hillman. (Dkt. No. 57 at 3.) The Kodak/Heidelberg facts are very similar to the Hillman/Minute Key facts.

Finally, the Court notes that Cooley has taken no steps to end their relationship with either Minute Key or Hillman. Cooley still holds Minute Key files and has sent no letter of termination. (Dkt. No. 77 at 1; Dkt. No. 115 at 9:1–2; 22:12–13); *see Jones v. Rabanco, Ltd.*, No. C03-3195P, 2006 WL 2237708, at *4 (W.D. Wash. Aug. 3, 2006) (holding on to client files is an indication of an ongoing client relationship); Texas Rules Rule 1.15(d). Further, Cooley performed work for Minute Key after the Hillman acquisition, and even provided some work (even if it was for an old project) after the Hillman/Minute Key merger. At oral argument, Cooley argued that "the mere passage of time alone can't be sufficient to form a new client relationship with a new entity." (Dkt. No. 115 at 23:9–11.) The Court's view is just the opposite: the mere passage of a few months is not sufficient to terminate a pre-existing and long-lasting attorney-client relationship. The Court concludes that, Hillman is a current client of Cooley.

> iv.     *Even if Not, the Issues in This Case are Substantially Related to Cooley's Past Representation.*

Having found that Hillman is a current client of Cooley, the Court's inquiry could end. Even if this conclusion is wrong, the Court also finds that Cooley would still have a conflict of

interest because the subject matter of the current suit is substantially related to Cooley's past representation of Minute Key.

As mentioned above, a conflict of interest with a former client exists if the current representation bears a "substantial relationship between the subject matter of the former and present representations" or there is a risk of the improper use of confidential information. *In re Am. Airlines*, 972 F.2d at 614–15. To that aim "the subject matter need not be relevant in the evidentiary sense to be substantially related[;] [instead,] [i]t need only be akin to the present action in a way reasonable persons would understand as important to the issues involved." *John Crane Prod. Sols.*, 2012 WL 3453696 at *2 (citing *In re Corrugated Container Antitrust Litig.,* 659 F.2d 1341, 1346 (5th Cir. Unit A Oct.1981), *abrogated in part on other grounds by Gibbs,* 742 F.2d 181) (internal quotation marks omitted). Some courts have recognized that a broad general counsel like representation poses a high risk that confidential information may be used against that client in a future adverse matter. *VECC, Inc. v. Bank of Nova Scotia*, 222 F. Supp. 2d 717, 721–22 (D.V.I. 2002).

From a review of the entire record, the Court finds that Mr. Pittard's work for Minute Key repeatedly exposed him to confidential information which is directly at issue to the present case. Mr. Pittard regularly attended and participated in board meetings over a long period of time. (Dkt. No. 32 at 1, 12.) At these meetings Mr. Pittard was exposed to highly confidential discussions related directly to the '446 Patent and to its family within what has been categorized as: "Minute Key's product development, patent strategies, and competitive analysis." (*Id*. at 2–5; Dkt. No. 115 at 11:14–13:23, 14:7–14:12, 15:7–19 16:25–17:7.) In fact, in at least one board meeting Mr. Pittard sat through a multi-hour presentation by Minute Key's outside IP counsel on the status of Minute Key's patent litigation. (Dkt. No. 115 at 25:5–8.) The same patents, products, and defendant are

involved in this case. Even if, contrary to the Court's earlier conclusion, Hillman is not a current

client, Cooley's prior representation of Minute Key was substantially related to the current action

and would be a conflict of interest.

### B. Disqualification is Appropriate

Cooley is adverse to Hillman in this case. Since Hillman is a current client of Cooley,

Cooley cannot represent KeyMe without Hillman's consent.[15] Model Rules Rule 1.7; *see also*

Model Rules 1.7 Comment 6 ("Thus, absent consent, a lawyer may not act as an advocate in one

matter against a person the lawyer represents in some other matter, even when the matters are

wholly unrelated."); *In re Dresser Industries*, 972 F.2d at 545 ("Unquestionably, the national

standards of attorney conduct forbid a lawyer from bringing a suit against a current client without

the consent of both clients."). Hillman has not consented to Cooley's representation of KeyMe in

this case. (Dkt. No. 32 at 10.) As such, the Court finds that disqualification is necessary in this

case.[16]

## IV.    CONCLUSION

For the foregoing reasons, the Court is of the opinion that the Motion to Disqualify should

be and hereby is **GRANTED**. Further, the Court finds that it would be improper for the Court to

consider the pending 12(b) motions in this case, since they were prepared by Cooley. *See Acad. of*

---

[15] Alternatively, Cooley's past representation of Minute Key is substantially related to the present case such that a conflict of interest remains, which also dictates that Cooley cannot now represent KeyMe without Hillman's consent.

[16] The Fifth Circuit has directed courts when ruling on motions to disqualify to carefully "consider '[a]ll the facts particular to [the] case . . . in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights.'" *In re ProEducation Int'l, Inc.*, 587 F.3d at 300 (quoting *U.S. Fire Ins.*, 50 F.3d at 1314.); *Woods v. Covington Cty. Bank*, 537 F.2d 804, 810 (5th Cir. 1976). In light of this directive, some courts have used a balancing test weighing the "likelihood of public suspicion against the interest in retaining counsel of one's choice" in deciding if disqualification is appropriate. *DataTreasury Corp. v. Wells Fargo & Co.*, No. 2:06-CV-72 DF, 2009 WL 10679840, at *9 (E.D. Tex. Dec. 30, 2009) (quoting *Cossette v. Country Style Donuts, Inc.*, 647 F.2d 526, 530 (5th Cir. 1981)). These other cases, however, deal primarily with conflicts of interests arising from former clients. The Court here finds that the situation is different for conflicts of interest from concurrent clients. In the Court's view, in the situation of concurrent representation the risk of public suspicion clearly outweighs that of a litigant's right to chose their counsel. *See Honeywell Int'l Inc. v. Philips Lumileds Lighting Co.*, No. 2:07-CV-463-CE, 2009 WL 256831, at *4 (E.D. Tex. Jan. 6, 2009).

*Allergy & Asthma in Primary Care v. Louisiana Health Serv. & Indem. Co.*, 384 F. Supp. 3d 644, 660–61 (E.D. La. 2018). As such, KeyMe's Motions to Dismiss for Improper Venue under Rule 12(b)(3) (Dkt. Nos. 12, 41) and Motion to Change Venue (Dkt. No. 14) are **DENIED WITHOUT PREJUDICE**.

It is further **ORDERED** that the above-captioned case is hereby **STAYED** for forty-five (45) days from the entry of this Order to allow KeyMe to retain new counsel. Not later than forty (40) days hereafter, the Parties shall jointly file a status report indicating their positions on how this case should best proceed once the stay is lifted. A courtesy copy of the same shall be delivered to chambers.

**So ORDERED and SIGNED this 14th day of February, 2020.**

RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE